# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 15, 2024

Lyle W. Cayce

Clerk

_____

No. 22-50368

_____

Heriberto Chavez; Evangelina Escarcega, *as the legal representative of* her son Jose Escarcega; Jorge Moreno,

*Plaintiffs—Appellees*,

*versus*

Plan Benefit Services, Inc.; Fringe Insurance Benefits, Incorporated; Fringe Benefit Group,

*Defendants—Appellants*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CV-659

_____

Before Wiener, Stewart, and Engelhardt, *Circuit Judges*.

Carl E. Stewart, *Circuit Judge*:

Heriberto Chavez, Evangelina Escarcega (representing her son, Jose Escarcega), and Jorge Moreno (collectively "Plaintiffs") seek to represent a class in a lawsuit against Plan Benefit Services, Fringe Insurance Benefits, and Fringe Benefit Group (collectively "FBG") for the alleged mismanagement of funds that Plaintiffs contributed to benefit plans through their employers. Because Plaintiffs have standing to sue and the district court did not abuse its discretion in the Rule 23 certification analysis, the district

No. 22-50368

court's order is AFFIRMED in part and REVERSED in part. The order is AFFIRMED insofar as it granted class certification under Rule 23 (b)(3) and REVERSED insofar as it granted class certification under Rule 23(b)(1). Additionally, this matter is REMANDED for further proceedings consistent with this opinion.

## I.    Background

### A.    FBG's Alleged Mismanagement of the CERT & CPT Trusts

FBG helps employers design and administer employee benefit programs that offer retirement and health and welfare benefits to their employees. In accordance with FBG's plan, employers disburse benefits to their employees through two trusts: (1) the Contractors and Employee Retirement Trust ("CERT"), which covers retirement plans; and (2) the Contractors Plan Trust ("CPT"), which covers health and welfare benefits. Each employer signs either a separate retainer agreement or an adoption agreement as part of their enrollment in a plan. FBG serves as "Master Plan Sponsor" and "Recordkeeper" for both CERT and CPT.

The contracts that FBG enters with employers also include a "Master Trust Agreement" granting FBG greater control over the CERT and CPT trusts. For example, the Master Trust Agreement allows FBG to determine the fees deducted from CERT and allows it to direct "banks and other entities holding Trust funds to pay those fees, including to FBG itself." As to CPT specifically, the Master Trust Agreement authorizes FBG to "calculate and deduct its own fees from employer contributions before remitting premium payments to the carriers."

FBG markets CERT and CPT to non-union employers seeking to compete for government contracts. To qualify for the contracts, employers must pay their employees prevailing wages—that is, the wages and benefits paid to the majority of similarly situated laborers in the area at the time. In

assisting employers with offering benefits under the prevailing wage laws, FBG offers plans with a combination of administrative and variable fees.

For example, each employer pays an identical, fixed administrative fee of $200, nondiscriminatory testing fee of $400, and indirect percentage-based fees totaling 1.15% of the company's assets in the trust. Variable fees are assessed based on the company's selections with FBG and the company's total size and structure. So, a company that offers its employees a 401(k) may be assessed different fees than another company that offers a money-purchase plan. "These structures are called Tiered 1-4, Graded 25, and Graded 50." While employers can choose a "'tiered' or 'graded' plan, [FBG] determines where the employer falls within [each] categorization scheme[.]"

Plaintiffs were employees of the Training, Rehabilitation & Development Institute, Inc. ("TRDI"). TRDI contracted with FBG for various services. It was required to provide wage and fringe benefits to its employees in an amount calculated by the applicable prevailing wage determination. It provided retirement plans under CERT and health and welfare plans under CPT. The agreement governing CERT, CPT, and TRDI allotted various "powers and responsibilities" to FBG. For example, FBG had the power to: (1) enter contracts imposing fees and other charges on the trusts and the plans; (2) instruct any insurance company with respect to investment or disbursement of investment funds on behalf of the Trustee; (3) require the Trustee to make disbursements for FBG's own fees in any amount that it directed; and (4) appoint and remove the Trustee.

Chavez participated in CPT, meaning that TRDI paid monthly contributions to CPT on his behalf, from which FBG deducted fees. TRDI contributed a certain amount of money to a fringe benefit account in Chavez's name for every hour that he worked, in accordance with federal and

state laws. This fringe benefit account was used to help pay Chavez's premiums incurred through his enrollment in health and welfare plans provided by TRDI. TRDI also paid a premium of $570.58 a month into CPT for these benefits to cover his insurance. At least ten percent of the premium amount was paid to FBG. These fees were taken from Chavez's individual health and welfare account. He contends that the "account was depleted more than it otherwise would have been if the fees had been reasonable." He also avers that the unreasonable fees are wholly responsible for "no amount ever [being] contributed [to his] retirement account."

Escarcega and Moreno participated in both CERT and CPT. Like Chavez, TRDI made contributions to the fringe benefit accounts based on the number of hours that Escarcega and Moreno worked. Under each plan, FBG's fees for plan administration services were subtracted from their individual accounts. They allege that FBG "deducted fees totaling more than 10% of these payments for their own compensation before remitting the remainder to" their medical insurance providers. Escarcega was also enrolled in a "limited medical plan" with Standard Security Life ("SSL") through CPT. He claims that "FBG deducted compensation for itself . . . for ancillary insurance premiums and fees of more than 17% of these payments, remitting the remaining amount as premiums to SSL."

## B.    *Procedural History*

In July 2017, Plaintiffs sued FBG for mismanaging their employee benefit plans by collecting excessive fees in violation of the Employee Retirement Income Security Act ("ERISA"). *See* 29 U.S.C. § 1001 *et seq*. Specifically, Plaintiffs asserted that FBG charged different rates for identical services and charged an excessive base fee. FBG moved to dismiss Plaintiffs' claims. The district court granted FBG's motion but gave Plaintiffs the opportunity to amend their complaint. Plaintiffs' amended complaint alleged

that FBG "accepted excessive fees, handpicked providers to maximize its profits, controlled disbursements from the trusts for its own benefit, and unlawfully procured indirect compensation." *Chavez v. Plan Benefit Servs.*, 957 F.3d 542, 544 (5th Cir. 2020). FBG moved to dismiss again for failure to state a claim under 21 U.S.C. §§ 1106(b) and § 1109(a) and lack of standing, which the district court denied.

Thereafter, Plaintiffs filed a motion for class certification. They sought to represent a class of "all participants in and beneficiaries of employee benefit plans that provide benefits through CERT and CPT, . . . from six years before the filing of this action [July 6, 2011] until the time of trial." The district court encountered a question of first impression: whether Plaintiffs had standing to sue FBG on behalf of unnamed class members from different contribution plans. It requested additional briefing on the issue and ultimately ruled that Plaintiffs had constitutional and statutory standing to sue FBG in a class-action context. On constitutional standing, the district court explained that Plaintiffs had demonstrated injury in fact, traceability, and redressability. Notably, it held that the class context was appropriate because "both the named and unnamed plaintiffs . . . are participants 'of plans that provide employee benefits through CPT or CERT.'" It concluded that commonality was sufficient to allow class certification at this stage.

As for statutory standing, the district court relied on a Sixth Circuit case, *Fallick v. Nationwide Mutual Insurance Company*, to hold that Plaintiffs' only burden at this stage was assuring the court of their own standing to sue FBG. 162 F.3d 410, 424 (6th Cir. 1998). Specifically, it cited *Fallick* for the proposition that "the standing-related provisions of ERISA were not intended to limit a claimant's right to proceed under Rule 23 on behalf of all individuals affected by the [fiduciary's] challenged conduct, regardless of the representative's lack of participation in all the ERISA governed plans involved." *Id.* at 410; Fed. R. Civ. P. 23. It reasoned that a deeper inquiry

into the appropriateness of Plaintiffs as class representatives was reserved for the Rule 23 analysis, not constitutional or statutory standing. It held in Plaintiffs' favor and certified a Rule 23(b)(1)(B) class of 90,000 employees. *Chavez v. Plan Benefit Servs., Inc.*, No. 1:17-CV-659-SS, 2018 WL 3016925, at *7–8 (W.D. Tex. June 15, 2018).

FBG appealed, and a panel of this court vacated and remanded, holding that the district court failed to engage in the "rigorous analysis" necessary for certifying a class action under Rule 23. *See Chavez*, 957 F.3d at 544. On remand, Plaintiffs amended their motion for class certification, and the case was reassigned. The parties then presented oral argument and submitted supplemental briefing on standing.

Upon consideration, the district court certified the following two classes:

> (1) All participants and beneficiaries of plans that provide employee benefits through CPT—other than [FBG's] officers, directors, or relatives— from July 6, 2011, until trial; and

> (2) All participants and beneficiaries of plans that provide employee benefits through CERT—other than (a) participants and beneficiaries of custom plans, and (b) [FBG's] officers, directors, or relatives—from August 31, 2014, until trial.

As of February 2021, the class included "224,995 participants and 2,994 plans in CERT as well as 68,066 participants and 350 plans in CPT."

FBG then filed the instant appeal, urging this court to determine that Plaintiffs lack standing to represent the class and reverse the district court's decision that Rules 23(b)(1)(B) and (b)(3) are proper vehicles for class certification. According to FBG, certification was improper, and we should remand for proceedings on only Plaintiffs' claims.

## II.    Standard of Review

"Standing is a question of law that we review de novo." *N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) (citation and emphasis omitted). We review "all facts expressly or impliedly found by the district court" for clear error. *Rivera v. Wyeth–Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002).

We review class certification decisions for abuse of discretion. *See Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998) (citation omitted). "Implicit in this deferential standard is a recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation." *Id.* (citation omitted). "We review de novo, however, whether the district court applied the correct legal standards in determining whether to certify the class." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766 (5th Cir. 2020) (emphasis, quotations, and citations omitted).

## III.    Discussion

Preliminarily, we address FBG's characterization of Plaintiffs' theory on appeal. FBG asserts that Plaintiffs have insisted that their lawsuit is only, or at least primarily, about excessive fees that they and the unnamed class members were subjected to by FBG. But that depiction of Plaintiffs' theory fails to capture the entire breadth of their argument.

Plaintiffs have always sought to make this case about FBG's general practices in upholding their duties as fiduciaries of the CERT and CPT trusts. Indeed, their complaint focuses on the "Master Trust Agreement" and "Adoption Agreement" as the mechanisms through which FBG was able to charge the excessive fees to the various employees that participated in their plans. Furthermore, they have always sought to bring this action on behalf of members of the trust, not just employees who were allegedly charged

excessive fees. As Plaintiffs explain, the harm not only derives from FBG's charging of excessive fees but also from the financial harm that FBG allegedly caused to the CERT and CPT trusts.

We disagree with FBG that this case is *only* about the payment of excessive fees. The more apt characterization is detailed in Plaintiffs' complaint, which explains that this case is also about FBG's alleged mismanagement of the trusts that they compel each employee to pay into through contracts with their employers. Likewise, the class that the district court eventually certified further reflects this understanding of Plaintiffs' theory. With that said, we press on to FBG's standing argument.

### A.   Standing

FBG asserts that the district court erroneously determined that Plaintiffs had standing to challenge fees that they were never subjected to, in plans that they never participated in, relating to services that they never received, from employers for whom they never worked. It avers that the district court skipped these justiciability concerns by following incorrect and nonbinding out-of-circuit precedent, which resulted in an inappropriate focus on class certifiability despite clear standing issues. More specifically, FBG contends that class action lawsuits cannot be used to aggregate claims of participants in plans in which they have no stake.

In response, Plaintiffs insist that the district court simply recognized that FBG's concerns were best addressed during the Rule 23 analysis and correctly relied on the Sixth Circuit's analysis in *Fallick* to conclude that Plaintiffs have standing. 162 F.3d at 424. We agree with Plaintiffs on this issue.

Federal courts have a continuing obligation to address jurisdictional defects. *See Lewis v. Hunt*, 492 F.3d 565, 568 (5th Cir. 2007). Constitutional standing is one such consideration. The doctrine requires a plaintiff to

demonstrate "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A*, 140 S. Ct. 1615, 1618 (2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992)).

The concreteness and particularity of Plaintiffs' injuries are especially relevant in this case. The Supreme Court has explained that a concrete injury is one that is "real, and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (quotations omitted) (explaining that for an injury to be concrete, it "must actually exist"). And for an injury to be particularized, it must "affect the plaintiff in a personal and individual way." *Id.* at 339 (quotations and citation omitted).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. Plaintiffs carry this burden throughout the litigation proceedings. *See id.* ("Since [standing is not a] mere pleading requirement[] but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.").

The Supreme Court has repeatedly explained that "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring)). The Court has also cautioned us against dispensing standing "in gross" in a class-action context—instead instructing us to ensure that plaintiffs "demonstrate standing for each claim that they press and for each form of relief that they seek[.]" *Id.* (citation omitted).

FBG raises important questions about the order and depth in which this court grapples with constitutional standing and the Rule 23 inquiry. There is a split on this very question that exists across the circuits. *See Standing to litigate what? The relationship between the class representatives' claims and those of absent class members*, 1 WILLIAM B. RUBENSTEIN, NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 2:6 (6th ed.) (identifying a circuit split on whether a "class representative may seek to litigate harms not precisely analogous to the ones she suffered but harms that were nonetheless suffered by other class members") [hereinafter, "*Newberg on Class Actions*"]. The split stems from the notion that "[t]here cannot be a disjuncture between the harm that the plaintiff suffered and the relief that she seeks." *Id.* While relatively tame in individual cases, the disjuncture issue becomes increasingly complex as courts begin to aggregate claims for class consideration. *Id.*

*Newberg on Class Actions* explains that appellate courts have resolved the disjuncture issue using two methods: (1) Some courts, "having determined that the class representative has standing to pursue her own claims, move on from the standing inquiry and approach the disjuncture as an issue of class certification"; or (2) Other courts "simply find that the class representative lacks standing to pursue the class members' claims because she did not suffer their injuries[.]" *Id.* For the purposes of our analysis herein, the first approach will be referred to as the class certification approach, while the latter is the standing approach.

While the Supreme Court has yet to declare which approach is correct, its standing jurisprudence provides guidance as we weigh the potential options. We examine each respective approach and conclude that, in this case, we may proceed to Rule 23 under either theory.

### 1.    *The Class Certification Approach*

The Supreme Court first grappled with the disjuncture issue in *Sosna v. Iowa*, 419 U.S. 393 (1975). There, a wife brought a class action suit challenging the constitutionality of an Iowa state law that required individuals seeking a divorce to have been a resident of the state for at least one year preceding the filing of the divorce petition. *Id.* In upholding the constitutionality of Iowa's law, the Court stated that a "named plaintiff in a class action must show that the threat of injury . . . is 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Id.* at 403. It continued that the named plaintiff "must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court." *Id.*

The *Sosna* court reasoned that its "conclusion [did] not automatically establish that appellant [was] entitled to litigate the interests of the class she [sought] to represent." *Id.* But it explained that "the focus of examination" nonetheless shifted "from the elements of justiciability to the ability of the named representative to 'fairly and adequately protect the interests of the class.'" *Id.* (quoting FED. R. CIV. P. 23(a)). This conclusion evinces the Court's understanding that the Article III standing analysis, as with any justiciability inquiry, must precede any questions of class certifiability under Rule 23.

The Supreme Court later applied the same reasoning from *Sosna* in *General Telephone Company of Southwest v. Falcon*, 457 U.S. 147, 157–60 (1982). There, the named plaintiff, a Mexican-American employee, was passed over for a promotion and brought a class-action suit against his employer for alleged discrimination in both the hiring and promoting of minority employees. *Id.* at 150. While the Court acknowledged that the named plaintiff established standing to represent a class comprised of other minorities passed over for *promotions*, it declined to allow him to represent

persons that were never hired because of an allegedly discriminatory *application* process. *Id.* at 157–60. Notably, the Court came to its conclusion in the Rule 23(a) commonality analysis—not during the constitutional or statutory standing inquiries. *Id.*

At the circuit-court level, the class certification approach was followed by the Sixth Circuit in *Fallick* and has gained traction in the First, Third, and Ninth Circuits.[1] *See* 162 F.3d at 424; *see also In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018) ("Nothing . . . suggests that the claims of the named plaintiffs must in all respects be identical to the claims of each class member. Requiring that . . . to establish standing would confuse the requirements of Article III and Rule 23." (internal quotations and citations omitted)); *Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 133 (3d Cir. 2022) (explaining that named plaintiffs established standing and that defendants' "concerns regarding the representation of absent class members might implicate class certification or damages but are distinct from the requirements of Article III"); *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 2509 (2020) ("As we have previously explained, once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court

---

[1] We further note the class certification approach's prominence in the district courts of most circuits, including our own. *See, e.g.*, *In re RadioShack Corp. ERISA Litigation*, 547 F. Supp. 2d 606, 611 (N.D. Tex. 2008) (holding that the named plaintiff established individual standing and stating that whether he could represent the other ERISA class members "should be left for later determination under Rule 23"); *see also Molock v. Whole Foods Market, Inc.*, 297 F. Supp. 3d 114, 130 (D.D.C. 2018), *aff'd on other grounds*, 952 F.3d 293 (D.C. Cir. 2020) (rejecting defendants' standing argument that "Plaintiffs cannot pursue claims on behalf of putative class members from states in which Plaintiffs do not reside or suffered no injury" because "such considerations are appropriately resolved at the class certification stage, which is designed precisely to address concerns about the relationship between the class representative and the class" (internal quotations and citations omitted)).

proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met. Any issues regarding the relationship between the class representative and the passive class members—*such as dissimilarity in injuries suffered*—are relevant only to class certification, not to standing." (emphasis added) (internal quotation marks and citations omitted)).

### 2.    *The Standing Approach*

Less than a decade after *Sosna*, the Supreme Court encountered the disjuncture issue again in *Blum v. Yaretsky*, a Medicaid case involving a Fourteenth Amendment challenge to certain nursing homes' unilateral decisions to transfer patients to facilities with lesser or higher levels of care than the patients already had without any administrative hearings for their desires to be heard. 457 U.S. 991 (1982). The Court's analysis primarily focused on standing, as it explained that:

> It is not enough that the conduct of which the plaintiff complains will injure *someone*. The complaining party must also show that he is within the class of persons who will be concretely affected. Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject.

*Id.* at 999 (emphasis in original) (citing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–67 (1972)). In concluding that the plaintiffs lacked standing, the Court explained that "the conditions under which such transfers [to higher levels of care] occur are sufficiently different from those [that] respondents do have standing to challenge that any judicial assessment of their procedural adequacy would be wholly gratuitous and advisory." *Id.* at 1001. The Court's attention in *Blum* clearly centered on the "kind" of injury and whether that injury placed the potential representative "within the class of persons who will be concretely affected." *Id.* at 999.

Fourteen years later, the Supreme Court grappled with the standing approach again in *Lewis v. Casey*, 518 U.S. 343, 346 (1996). There, the Court considered a class action brought by a group of Arizona inmates alleging a denial of their right of access to the courts. *Id.* The named plaintiff claimed that he was denied access to the courts due to his illiteracy and further averred that the prison refused to provide him with any services to assist him. *Id.* at 356. While the Court agreed that the named plaintiff likely had standing to sue, it declined to extend standing to others who were denied access to the courts for reasons other than illiteracy. *Id.* at 358 (refusing to provide standing to enter the class to "non-English speakers," "prisoners in lockdown," and the "inmate population at large").

The *Lewis* court supported its cabining of the named plaintiff's standing by explaining that the "actual-injury requirement would hardly serve [its] purpose . . . if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration." *Id.* at 357 (emphasis in original). It continued that "[t]he remedy must of course be limited to the inadequacy that reduced the injury in fact that the plaintiff has established . . . This is no less true with respect to class actions than with respect to other suits." *Id.* Put simply, the Court refused to allow a plaintiff whose injury stemmed from his illiteracy represent those that had suffered the same injury for an entirely different, unrelated reason. *Id.*

Finally, the Supreme Court's decision in *Gratz v. Bollinger* marked a further development in the standing approach. *See* 539 U.S. 244 (2003). That landmark case involved a class-action challenge to the University of Michigan's ("UM") race-based affirmative action policies in its admissions process. *Id.* at 252. The named plaintiff in that case sought admittance to UM by transferring from another university. *Id.* Given the Court's decision in *Lewis*, one might think that any class that he represented would be limited to

other transfer students that alleged to have been harmed by UM's race-based admissions policies. 518 U.S. at 357. The Court, however, allowed him to not only sue on behalf of transfer students but also prospective freshmen that alleged the same kind of harm. *Gratz*, 539 U.S. at 244. In rejecting the respondent's challenge to the plaintiff's standing at the certification stage, the Court distinguished *Gratz* from *Blum*, holding that UM's "use of race in undergraduate transfer admissions does not implicate *a significantly different set of concerns* than does its use of race in undergraduate freshman admissions." *Id.* at 265 (emphasis added).[2]

Several tests have emerged from the Supreme Court's decision in *Lewis*, offering varied levels of strictness to the standing inquiry in the class context. The broadest interpretation comes from the Ninth Circuit, which has "interpreted the . . . requirements of the *Lewis* decision loosely, requiring only broad similarity of injury between the named plaintiffs and passive class members." *Newberg on Class Actions* § 2:6 (citing *Armstrong v. Davis*, 275 F.3d 849, 867 (9th Cir. 2001) ("When determining what constitutes the same type of relief or the same kind of injury, we must be careful not to employ too narrow or technical an approach. Rather, we must examine the questions realistically: we must reject the temptation to parse too finely, and consider instead the context of the inquiry." (abrogated on other grounds)).

Not every circuit, however, views *Lewis* and its progeny so liberally. The Second Circuit, for example, takes a stricter approach and has developed a two-part test for class standing. *See, e.g.*, *Barrows v. Becerra*, 24 F.4th 116,

---

[2] *See Newberg on Class Actions* § 2:6 (stating that the Court's treatment of standing in *Gratz* "suggests that the disjuncture problem may be overcome by demonstrating a sufficient relationship between the named plaintiffs' injury and the class's such that no disjuncture exists and the former can litigate the claims of the latter" (citation and footnote omitted)).

129 (2d Cir. 2022). Its test requires a named plaintiff to plausibly allege "(1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant," and "(2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *Id.* (internal quotations, citation, and footnote omitted). It has explained that when this test "is satisfied, the named plaintiff's litigation incentives are sufficiently aligned with those of the absent class members[, such] that the named plaintiff may properly assert claims on their behalf." *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of N.Y. Mellon*, 775 F.3d 154, 161 (2d Cir. 2014).

Notably, the Eleventh Circuit takes an approach akin to the Second Circuit. *See Fox v. Ritz-Carlton Hotel Co., LLC*, 977 F.3d 1039, 1046 (11th Cir. 2020) ("First, the class representative must satisfy the individual standing prerequisites of the case or controversy requirement. Second, the class representative must also be part of the class and possess the same interest and suffer the same injury as the class members.") (internal quotation marks and citations omitted). In *Fox*, the Eleventh Circuit considered a putative class action against a restaurant owner under the Florida Deceptive and Unfair Trade Practice Act[3] for his alleged failure to provide adequate notice that there was an automatic gratuity or service charge added to each customer's check. *See id.* at 1039.

While the Eleventh Circuit reversed and remanded due to the plaintiff's failure to exhaust administrative remedies, it made clear that he had "class representative standing." *Id.* at 1047. Specifically, the court explained that the district court "conflate[d] the requirements of individual

---

[3] Fl. Stat. §§ 501.201 *et seq.* (2023).

standing with those for a class representative." *Id.* It continued that "class standing does not necessarily require that the class representative suffer injury at the same place and on the same day as the class members. Rather, [standing] requires that the named plaintiff and class members have the same interest and suffer the same injury." *Id.* (internal citation and quotation omitted).

> *B.*     Angell

Relevantly, a panel of this court recently grappled with the disjuncture issue. *Angell v. Geico Advantage Ins. Co.*, 67 F.4th 727 (5th Cir. 2023). There, a group of plaintiffs (the "Angell Plaintiffs") sought "to represent a class of insureds claiming that GEICO failed to fully compensate them for the total loss of their vehicles under their respective insurance policies." *Id.* at 731. Geico challenged the Angell Plaintiffs' standing, arguing that while each plaintiff had standing to "bring a claim on his or her own[,] . . . the nature of each [] injury" failed to "extend to the scope of the injury alleged under the class's definition, making [them] unsuitable class representatives." *Id.* at 733.

In rejecting Geico's argument, we recognized that "[t]here has yet to be a bright line drawn between the issues of standing and class certification." *Id.* (citing *Gratz*, 539 U.S. at 236 n.15). Rather than attempting to draw that line, the panel analyzed the Angell Plaintiffs' standing under both the "more intensive standing approach" and "the more forgiving class certification approach." *Id.* at 734 (internal quotations and citation omitted).

The *Angell* court held that the Angell Plaintiffs had standing to represent the class under the standing approach because their injuries and interests were "sufficiently aligned with those of the class." *Id.* at 734–35 (examining whether the Angell Plaintiffs possessed "sufficiently analogous" injuries as the class they sought to represent). The court likewise held in their favor under the class certification approach because Geico already had

conceded that the Angell Plaintiffs established standing, and that was all that this more forgiving approach required. *Id.* at 734. With both tests satisfied, the panel conducted the Rule 23 inquiry. *Id.* at 736–41.

While the *Angell* court's application of the two competing approaches has no dispositive effect on the ultimate result in this case, it still provides a useful analytical framework as we endeavor to grapple with an identical issue in the instant case. Just as the panel did in *Angell*, we decline to adopt either the class certification or standing approach because we have determined that Plaintiffs have standing under both theories. 67 F.4th at 734–36.

### C.     *Neither Approach Bars Plaintiffs from Rule 23 Consideration*

#### 1.     *The Class Certification Approach*

The class certification approach provides a direct route to the Rule 23 inquiry. As a reminder, the approach requires Plaintiffs to first establish their standing to sue FBG for allegedly: (1) hiring itself to perform services to Plaintiffs' insurance plans; (2) paying itself excessive compensation out of plan assets; and (3) arranging for excessive compensation to itself from other service providers to the plans. Assuming they can establish their standing to sue, we then proceed to the Rule 23 analysis to determine whether Plaintiffs can adequately and fairly represent the entire group's interests. *See Sosna*, 419 U.S. at 403; *Falcon*, 457 U.S. 157–60. Plaintiffs may proceed as class representatives only after successfully clearing both hurdles.

Here, Plaintiffs have established their standing to sue FBG. First, they have demonstrated injury in fact by alleging that FBG abused its authority under the Master Trust Agreement by hiring itself to perform services paid with funds from the CERT and CPT trusts, effectively devaluing the trusts and retirement benefits that Plaintiffs otherwise would have accrued with their employer. Second, they have established that their injury is traceable to FBG's conduct by providing evidence of FBG's direct control over the

CERT and CPT trusts and the underlying contractual agreement with their employer. Finally, their injury is redressable in this court by awarding monetary damages or other relief.[4] Any further analysis on the appropriateness of appointing Plaintiffs as the class representatives under this approach would occur during the Rule 23 inquiry. Consequently, we move on to an analysis under the standing approach.

### 2.    *The Standing Approach*

The standing approach offers three different avenues for evaluating Plaintiffs' Article III standing: (1) the *Lewis* test, requiring us to consider whether Plaintiffs' harm is so unique that it warrants an isolated remedy that would be inappropriate if extended to other class members, *see* 518 U.S. at 358; (2) the *Gratz* test, which requires us to evaluate if Plaintiffs' injury implicates "a significantly different set of concerns" from the other potential class members, *see* 539 U.S. at 265; or (3) the Second or Eleventh Circuit tests for class representative standing, which are hybrid versions of the *Lewis* and *Gratz* tests. *See supra*. We address each in turn.

### a.    Lewis

Under *Lewis*, we analyze whether Plaintiffs alleged a harm that is unique to them, such that it would be unsuitable to permit other nonrelated harms in the same lawsuit. On this record, they have not alleged a narrow injury. Plaintiffs claim that FBG "impos[ed] sky-high administrative costs, . . . enrich[ing] [itself] at the expense of the Trusts' participating employee benefit plans and the employees who receive their retirement and healthcare benefits through those plans." FBG does not contend that the

---

[4] To be clear, FBG does not argue that Plaintiffs lack standing to proceed outside of the class context. Rather, its suit seeks to reverse the district court's class certification because it alleges that Plaintiffs lack standing to represent the other class members.

other class members seek or require a different remedy, nor does it assert that the injury is unique to Plaintiffs. Instead, it merely insists that because Plaintiffs had different plans and employers, they lack standing to challenge the same general practices that each member of the class was subjected to. This theory is unsupported by *Lewis*.

### b.    Gratz

The *Gratz* test is also in Plaintiffs' favor. Simply put, Plaintiffs' claim that FBG mismanaged the trust to their detriment "does not implicate a significantly different set of concerns than does" FBG's mismanagement of the trust for the unnamed class members. 539 U.S. at 265. That there is an abundance of employers and plans does nothing to shift the calculus of that conclusion either. Ultimately, Plaintiffs have undeniably suffered the same kind of loss as the unnamed class members because of FBG's alleged misconduct. *Id.* Put another way, the set of concerns here are identical between Plaintiffs and the unnamed class members: the return of trust funds that each plaintiff would otherwise have been entitled to if FBG had not violated ERISA. Furthermore, at no stage in this litigation, has FBG argued that there are different concerns across the class.

### c.    *The Second & Eleventh Circuit Tests*

Under the Second Circuit's test, we examine whether Plaintiffs have established "(1) that [they] personally [] suffered some actual injury as a result of the putatively illegal conduct of the defendant," and "(2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *Barrows*, 24 F.4th at 129. The first prong is a traditional standing analysis, which we have already completed in Plaintiffs' favor. *See supra* Part III.C.2.a. And the second prong is nothing more than the *Gratz* test, calling for us to consider whether FBG's conduct "implicates the same

set of concerns" as Plaintiffs' injury. *Barrows*, 24 F.4th at 129. As we have already explained, Plaintiffs' claim and FBG's conduct wholly implicate the same concerns with respect to each member of the class that Plaintiffs seek to represent. *See supra* Part III.C.2.b.

The Eleventh Circuit's method yields the same result. That test requires us to consider whether Plaintiffs "and [the other] class members have the same interest and suffer[ed] the same injury." *Fox*, 977 F.3d at 1047. Plaintiffs and the other class members undoubtedly have the same interest: the return of trust funds or any other vindication of their financial harm. The two also share the same injury: FBG's mismanagement of trust funds and charging of excessive fees deprived them of some portion of the benefits that they were entitled to. Again, that these injuries were the result of different agreements with different employers does not alter that the harm occurred directly from FBG's misconduct pertaining to the trusts that it required participation in through the incorporation of certain provisions in each contract.

Despite FBG's arguments to the contrary, there is no support for a conclusion that Plaintiffs lack constitutional standing to pursue this claim on behalf of other similarly situated plaintiffs allegedly harmed by FBG's mismanagement of the CERT and CPT trusts, charging of excessive fees placed into those trusts, and self-dealing in violation of ERISA.

Having analyzed Plaintiffs' standing under each possible methodology in the Supreme Court and Fifth Circuit's jurisprudence, we are satisfied that they have established their standing to sue FBG under Article III. Whether the district court appropriately determined that they are proper class

representatives now depends on whether Plaintiffs satisfy the Rule 23 thresholds for such a status.[5]

### D.    Rule 23 Analysis

The district court conducted a thorough analysis of Rules 23(a), (b)(1), and (b)(3). It concluded that Plaintiffs satisfied all of Rule 23(a)'s adequacy-of-representation requirements and further demonstrated that this case can be certified under either Rule 23(b)(1) or (b)(3). FBG asserts no challenge to the district court's Rule 23(a) analysis.[6] Instead, it focuses on the district court's Rule 23(b)(1) and (b)(3) determinations.[7] It avers that the district court abused its discretion by: (1) failing to account for the wide variety of plans included in the class and (2) sanctioning hundreds of mini-trials because of the individualized nature of the class claims. We agree that the requirements for class certification under Rule 23(b)(3) have been met, but hold that mandatory class status under Rule 23(b)(1) is inappropriate because this is primarily an action for damages and it is not evident that individual adjudications would substantially impair the interests of members not parties to the individual adjudications. *See* Fed. R. Civ. P. 23(b)(1).

---

[5] Statutory standing is a key requirement for Plaintiffs as well. The district court held that Plaintiffs had statutory standing. On appeal, FBG's primary brief does not contest the district court's determination on this issue, so it is not presently before this court. *See United States v. Fernandez*, 48 F.4th 406, 412 (5th Cir. 2022) ("[F]ailure adequately to brief an issue on appeal constitutes waiver of that argument." (internal quotation and citation omitted)).

[6] While FBG seemingly takes issue with the district court's Rule 23(a) commonality analysis, its stated concerns are limited to its argument that the district court wholly relied on its commonality determinations to satisfy Rule 23(b)(3) predominance.

[7] As a reminder, we review the district court's class certification under a deferential abuse-of-discretion standard. *See Allison*, 151 F.3d at 408.

### 1.   *Rule 23(b)(1)(B)*

The district court determined that Plaintiffs had met their burden to certify a class under Rule 23(b)(1)(B). Rule 23(b)(1)(B) prevents the prejudicing of parties after the initial suit when subsequent suits involve the same subject matter. *See* Fed. R. Civ. P. 23(b)(1)(B). Specifically, it stops one party from collecting damages at the expense of other parties and protects later parties from being bound by the judgment of a case in which their interests were not adequately represented. *See id.* (preventing separate actions where there is a "risk of . . . adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests").

FBG asserts that the "district court's analysis completely fails to account for the central fact that this proposed class involves vastly different plans and fees." It also contends that the district court incorrectly assumed that an accounting for Plaintiffs' claim would be dispositive in any way for any other plan members. The district court certified a mandatory class under Rule 23(b)(1) on the basis that damages should not be granted in multiple actions and that defendants might be subjected to incompatible standards by separate adjudications. The district court weighed the differences and similarities among the plans and determined that they were sufficiently similar such that deciding Plaintiffs' case as an individual action would have unwanted or impermissible effects on similarly situated employees that contributed to the CERT and CPT trusts through different employers. Moreover, it recognized that "prosecuting separate actions could substantially impair the putative class members' ability to protect their interests because Plaintiffs are alleging two claims central to all class members." Namely, whether FBG is or is not a fiduciary, and, if so, whether it breached its duties in that role.

However, the ability of individual class members to opt out and pursue separate remedies should be preserved despite the claim for damages in the class complaint. A large part of the monetary relief that Plaintiffs seek stems from their desire to disgorge FBG of ill-gotten profits, thus restoring assets to the CERT and CPT trusts. In *Langbecker v. Electronic Data Systems Corp.*, we held that "[t]he focus on monetary damages would set this case apart from the examples of classic Rule 23(b)(1) class actions, which are based on situations 'in which different results in separate actions would impair the opposing party's ability to pursue a uniform course of conduct.'" 476 F.3d 299, 318 (5th Cir. 2007) (quoting 7A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1773, at 16 (2005 ed.)).

Although the district court weighed numerous other factors in certifying the class under Rule 23(b)(1)(B), such as: (1) whether prosecuting these actions separately would be "'dispositive' of the interests of other class members," (2) the possibility of a due process violation against FBG, (3) the degree of prejudice FBG could potentially suffer through a Rule 23(b)(1)(B) class certification, and (4) whether Plaintiffs' requested monetary and equitable relief was possible through a Rule 23(b)(1)(B) class, the class claims are primarily for damages and the varied amounts each class member may be owed. The inclusion of claims for injunctive and declaratory relief does not change the nature of this action. Rule 23(b)(3) certification, which permits class members to opt out, is the appropriate vehicle for such class actions.

The Supreme Court has cautioned against certification under Rule 23(b)(1)(B). *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845–48 (1999) (overviewing the many concerns that follow mandatory opt-ins associated with class certification under Rule 23(b)(1)(B)). Certification under Rule 23(b)(1) is improper here because this is primarily an action for damages and it is not evident that individual adjudications would substantially impair the

interests of members not parties to the individual adjudications. *See* Fed. R. Civ. P. 23(b)(1). In recognition of the Court's warning, we analyze the district court's Rule 23(b)(3) determination.

### 2.    *Rule 23(b)(3)*

The district court also held that Rule 23(b)(3) was another potential vehicle for certifying Plaintiffs' class because of the common questions of law and fact as to whether FBG owed fiduciary duties to the Plaintiffs and the other class members by virtue of their role in managing the CERT and CPT trusts. It further explained that this question percolated throughout the entirety of the claim as it involved whether that duty was breached. We examine its analysis and hold that the district court did not abuse its discretion.

Class certification under Rule 23(b)(3) requires Plaintiffs to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3). From this rule, courts have reduced the analysis to two inquiries: predominance and superiority. *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 626–29 (5th Cir. 1999). FBG does not contest the district court's determination on superiority, so our discussion focuses on predominance. "In order to 'predominate,' common issues must constitute a significant part of the individual cases." *Id.* at 626.

We have further clarified that the predominance analysis "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Bell Atl. Corp. v. AT&T Corp.*,

339 F.3d 294, 302 (5th Cir. 2003) (quotation marks and citation omitted). Moreover, "[t]he predominance requirement of Rule 23(b)(3), though redolent of the commonality requirement of Rule 23(a), is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)).

FBG contends that the district court abused its discretion by certifying the class under Rule 23(b)(3) because individualized issues of fee excessiveness predominate this dispute. It avers that the wide variety of different fees and plans will turn this case into a series of mini-trials. Specifically, it insists that there will need to be mini-trials on whether each of the FBG subsidiaries are functional fiduciaries as to each of the 3,344 plans. In support of that contention, it relies on the Tenth Circuit's decision in *Teets v. Great-West Life & Annuity Insurance Co.*, 921 F.3d 1200 (10th Cir. 2019), *cert. denied*, 140 S. Ct. 554 (2019). It contends that *Teets* demonstrates how intricate the functional-fiduciary analysis is, so the district court erred in holding that "fiduciary status could be determined on a class-wide basis by looking at a master trust agreement giving [FBG] 'authority over their own compensation.'" We examine each argument in turn.

### a.    FBG's Role as Fiduciary

First, we examine the district court's conclusion that this case will not devolve into a series of mini-trials on FBG's status as a fiduciary. The district court first examined that all the claims and defenses in the class involved "concepts of duty, breach, causation, and loss." *See In re Enron Corp. Secs., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 579 (S.D. Tex. 2003). It explained that whether FBG owed a duty to Plaintiffs was a common question across the class. Moreover, it observed that whether that duty was breached

was a similarly common question that was significant and likely dispositive over the entire class's claims.

In response, FBG maintains that those common questions fail to predominate the individualized inquiry into each plan that will necessarily follow. It cites *Teets* for the proposition that "Plaintiffs must establish that [FBG was the] functional fiduciar[y] as to each challenged action in relation to each plan." The district court disagreed, and so do we. Besides the fact that it was not bound by the Tenth Circuit's decision in *Teets*, the district court went a different direction than that court because it aptly recognized that trying this case separately would inevitably lead to the redundant production of evidence that is common across the class.[8]

For example, each plaintiff would certainly produce that plaintiff's own contract, which expressly makes FBG a fiduciary by incorporating the Master Trust Agreement. The predominant question from the production of the Master Trust Agreements is whether it operates as Plaintiffs assert. That question's commonality unequivocally dominates any potential individualized inquiries that could arise thereafter.[9] The district court did not abuse its discretion.

---

[8] FBG's other out-of-circuit authority is similarly unconvincing. For example, their reliance on the Eighth Circuit's decision in *McCaffree Financial Corp. v. Principal Life Insurance Company*, 811 F.3d 998 (8th Cir. 2016) is unpersuasive and distinguishable from the instant case because it involved a bargained-for fee arrangement made by an employer without any attack of the actual management of the trust that held the excessive fees. *Id.*

[9] FBG's argument here appears to be that it is entitled to hundreds of thousands of opportunities to prove that it is not a fiduciary to the CERT and CPT trusts. But it cites no law persuading us that the district court abused its discretion in refusing it that opportunity.

### b.    *FBG's Due Process Rights*

FBG also argues that the district court's decision to consider Plaintiffs' statistical evidence interferes with its constitutional right to due process by robbing it of its right "to defend against the alleged excessiveness of every fee paid by every plan in every geographic area on an individualized basis." But the nonbinding authority it cites for this right contradicts its assertions. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 670–71 (7th Cir. 2015) (rejecting a violation of a defendant's due process rights where there is "a common method for showing individual damages," such as "a simple formula [that] could be applied to each class member's employment records" because "that would be sufficient for the predominance and superiority requirements to be met") (quoting *Newberg on Class Actions* § 12:2)).

The Seventh Circuit's understanding of due process in *Mullins* aligns with the Supreme Court's jurisprudence on damage calculations through formulae and statistical modeling in the class context. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35–37 (2013) (permitting consideration of a model to determine a liability if it "measure[s] only those damages attributable to [the class's] theory"); *see also Tyson Foods*, 577 U.S. at 454–55. In short, the district court did not violate this precedent by acknowledging Plaintiffs' plan to establish FBG's liability using an arithmetic, formulaic method. So, FBG's due process rights are sufficiently protected, and the "[d]ifferences in the amount of damages . . . among class members are no bar to class certification."

### 3.    *Rule 23(c) Particular Issues & Subclasses*

Although we affirm certification under Rules 23(a) and (b)(3), we now address the district court's cursory Rule 23(c)(4)–5 analysis to provide guidance on remand. *See United States v. Murillo–Lopez*, 444 F.3d 337, 339 &

n.5 (5th Cir. 2006). We agree with the district court that Plaintiffs have met their burden of demonstrating that common issues predominate over the significant individual issues in the case. However, in its certification order, the district court did not indicate that it had seriously considered the administration of the trial.

Because common questions predominate the class, Rule 23(c)(4) and Rule 23(c)(5) are relevant here. *See Smith v. Texaco, Inc.*, 263 F.3d 394, 409 (5th Cir. 2001), opinion withdrawn, cause dismissed, 281 F.3d 477 (5th Cir. 2002) (internal citation omitted) ("Therefore, the cause of action, as a whole, must satisfy rule 23(b)(3)'s predominance requirement. Once that requirement is met, rule 23(c)(4) is available to sever the common issues for a class trial."); *Elson v. Black*, 56 F.4th 1002, 1007 (5th Cir. 2023) (acknowledging that subclasses under Rule 23(c)(5)—though "necessary to preserve the possibility of proceeding as a class"—do not "relieve [Plaintiffs] of their duty to show each subclass independently satisfi[es] the Rule 23 requirements").

In *In re Deepwater Horizon*, we concluded that "common and individual issues" can be divided and tried into "multi-phase trials under Rule 23(c)(4), which permits district courts to limit class treatment to 'particular issues' and reserve other issues for individual determination." 739 F.3d 790, 816 (5th Cir. 2014). As part of its 23(b)(3) analysis, the district court acknowledged that "the issues of causation and loss also support a finding of predominance" and "this case also relies upon common proof." However, the district court failed to sufficiently address concerns regarding the variability of individualized damages in the suit. Notably, "the predominance inquiry can still be satisfied under Rule 23(b)(3) if the proceedings are structured to establish 'liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members.'" *Id.* at 817. A class may be divided into subclasses

for adjudication of damages. Fed. R. Civ. P. 23(c)(5).[10] Moreover, "Rule 23(c)(4) explicitly recognizes the flexibility that courts need in class certification by allowing certification 'with respect to particular issues.'" *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 976 (5th Cir. 2000); Fed. R. Civ. P. 23(c)(4).[11] And, recognizing the necessity for individual damages calculations does not preclude class certification under Rule 23(b)(3). *See Comcast Corp.*, 569 U.S. at 42 (Ginsburg, J., dissenting); *see also* 2 W. Rubenstein, Newberg on Class Actions § 4:54, p. 205 (5th ed. 2012) (explaining that ordinarily, "individual damage[s] calculations should not scuttle class certification under Rule 23(b)(3)").

Moreover, in *Frey v. First National Bank Southwest*, we delineated the primary questions with regard to the defendant's liability and concluded that "[t]he answers to these questions [would] affect all class member's claims." 602 Fed. App'x. 164, 170 (5th Cir. 2015) (unpublished). Moreover, the *Frey* panel determined that "[t]hese common issues 'constitute a significant part of the individual cases," sufficient to meet the predominance requirement." *Id.* (citing *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986)). In response to the defendant's contentions that "the court must do an intensive individualized analysis to determine if each class member's account was personal," we held that "the fact that some inquiry into the nature of each account will have to be made does not render that issue predominant over the multiple common issues bearing on [defendant's] liability." *Id.*

Furthermore, *Chalmette Refining* instructed district courts to consider rigorously how they plan to "adjudicate common class issues in the first

---

[10] "When appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5).

[11] "When appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4).

phase and then later adjudicate individualized issues in other phases" of the multi-phase trial before the final decision is made to certify a class. *In re Deepwater Horizon*, 739 F.3d at 816. In *Chalmette Refining*, we admonished the district court because "[i]n stark contrast to the detailed trial plans in *Watson* and *Turner*, the district court simply concluded that '[t]he common liability issues can be tried in a single class action trial with any individual issues of damages reserved for individual treatment.'" *Madison v. Chalmette Refin., L.L.C.*, 637 F.3d 551, 556 (5th Cir. 2011) (citing *Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992) and *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006)).

"[O]ur precedent demands a far more rigorous analysis than the district court conducted." *See Chalmette Refin.* 637 F.3d at 557. By failing to adequately analyze and determine whether liability and damages should be bifurcated in certifying the class the district court abused its discretion. Correspondingly, as this court explained in *Madison v. Chalmette Refining, L.L.C.*, predominance may be ensured in mass tort litigation when a district court performs a sufficiently "rigorous analysis" of the means by which common and individual issues will be divided and tried. *Id.* at 556; *see also In re Deepwater Horizon*, 739 F.3d at 816.

Accordingly, we remand with instructions for the district court to consider whether severing liability from individual damage issues and trying them separately may be appropriate and would be in accord with this court's previous caselaw and Rule 23(c)(4)–(5). *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745–46 n.21 (5th Cir. 1996) ("The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule . . . ."); *see also In re Deepwater Horizon*, 739 F.3d at 807 n.66 (quoting *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) "[A] class action limited to determining liability on a class-wide basis,

with separate hearings to determine—if liability is established—the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed."). "This court has likewise approved mass tort or mass accident class actions when the district court was able to rely on a manageable trial plan—including bifurcation [of issues] and/or subclasses—proposed by counsel." *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006) (citing *Watson*, 979 F.2d at 1017–18 & n.9).

Aside from Plaintiffs' request for CERT and CPT subclasses, the district court should allow the parties moving for class certification to have a full opportunity to present proposals for their preferred form of class treatment. Furthermore, some of the arguable distinctions, as alleged by FBG, in the various retirement and welfare benefit plans could be handled via certification of specific issues or subclasses. "The burden is on Plaintiffs to demonstrate to the district court *how* certain proposed subclasses would alleviate existing obstacles to certification." *Elson*, 56 F.4th at 1007–08 (citing *Allison*, 151 F.3d at 420 n.15; *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 313 (5th Cir. 2000)). Use of subclasses or bifurcation of issues, pursuant to rule 23(c)(4) or 23(c)(5), as a remedy for manageability obstacles is supported by caselaw. *See In re Deepwater Horizon*, 739 F.3d at 817 (citing *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013); *Butler*, 727 F.3d at 800; *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).

On remand, the district court should consider whether liability and damages should be resolved commonly and whether injury, causation, and actual damages should be resolved individually. In doing so, we note that the district court has a number of options at its disposal, each of which may or may not be appropriate depending on how the case develops. We express no view on the district court's ultimate decision whether to divide this large,

complex litigation into smaller, more manageable pieces in light of today's opinion, nor do we opine on the ultimate merits of the substantive claims.

Because Plaintiffs have standing and certification is appropriate under Rule 23(b)(3), the district correctly determined that this litigation may proceed as a class-action lawsuit. Accordingly, the class certification is modified to certification only under Rule 23(b)(3).

## IV.   Conclusion

For the foregoing reasons, we AFFIRM the district court's order in part and REVERSE in part. The order granting class certification under Rule 23(b)(1) is REVERSED in part and granting certification under Rule 23(b)(3) is AFFIRMED in part. This matter is REMANDED for further proceedings consistent with this opinion.