# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 17, 2025

Lyle W. Cayce
Clerk

_____

No. 24-50044

_____

Cynthia Wilson; Nicholas Angelo; Erin Angelo,

*Plaintiffs—Appellants*,

*versus*

Centene Management Company, L.L.C.; Celtic Insurance Company; Superior HealthPlan, Incorporated; Centene Company of Texas, L.P.,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:20-CV-484

_____

Before Dennis, Southwick, and Engelhardt, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

This appeal concerns the appropriate test for determining a plaintiff's Article III standing at the class-certification stage. The Plaintiffs in this case asserted breach-of-contract claims against the Defendant insurance companies, alleging the provider lists were materially inaccurate, thereby causing the Plaintiffs and proposed class members to pay artificially inflated premiums. The district court denied class certification after concluding the Plaintiffs lacked standing due to their failure to establish an injury-in-fact.

No. 24-50044

The district court erred by failing to consider either approach identified by our precedent to determine standing at the class-certification stage. We VACATE and REMAND for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiffs and proposed class representatives, Cynthia Wilson, Erin Angelo, and Nicholas Angelo ("Plaintiffs"), brought suit on behalf of all individuals residing in Texas who from January 1, 2014, through December 31, 2021, purchased a policy under the "Ambetter from Superior HealthPlan" sold and managed by the Defendants Centene Management Company, L.L.C., Celtic Insurance Company, Superior HealthPlan Inc., and Centene Company of Texas, L.P., collectively referred to in this opinion as "Superior." The Plaintiffs entered health insurance contracts under the Ambetter plan through the Texas Health Insurance Exchange, Texas' Affordable Care Act ("ACA") marketplace website.

After obtaining coverage under the policy, the Plaintiffs individually were unable to obtain certain healthcare providers listed by Ambetter in its in-network provider directory. The Plaintiffs allege Superior's list of available providers supplied via the Ambetter plan was materially inaccurate, containing thousands of names of providers who were not, in fact, available to provide medical care. As a result, the Plaintiffs and proposed class members were overcharged when they paid artificially inflated premiums for access to providers who were not available.

As an insurance provider under the ACA, Superior is regulated by both Texas and federal law. Network adequacy is a federal requirement, meaning the network must be "sufficient in number and types of providers." 45 C.F.R. § 156.230(a)(1)(ii). Additionally, federal regulations require Superior to provide consumers with access to an "up-to-date, accurate, and complete provider directory," containing "all of the current providers" in a

manner that is "easily accessible." § 156.230(b)(2). The Texas Department of Insurance is responsible for overseeing and regulating the Ambetter plan and ensuring Superior's adherence to pertinent rules and regulations.

Superior's Ambetter plan is an Exclusive Provider Organization policy, which requires policyholders to use in-network healthcare providers. The marketplace website provides information including monthly prices, co-pay amounts, deductibles, and out-of-pocket maximums; it does not, however, supply in-network provider lists for any given plan. Instead, it provides links to an individual plans' provider directory. Ambetter uses a provider search engine, which allows users to access a subset of Ambetter providers based on the criteria a user puts into the search engine. At a minimum, these criteria include desired provider specialty and location. Superior's brief on appeal states that users do not have a means to view a comprehensive list of Ambetter's in-network providers because the results are always limited by the search criteria.

The Plaintiffs allege that Ambetter's provider directories were materially inaccurate. As a result, they allegedly paid artificially inflated premiums for access to providers who were not available to them. We examine the details for two of the Plaintiffs.

Plaintiff Cynthia Wilson, a breast cancer patient, purchased the Ambetter plan in January 2017, after reviewing the directory of in-network providers. Shortly thereafter, Ambetter assigned her a primary-care provider. Later that year, Wilson developed shingles and was referred to her Ambetter-assigned physician. The assigned physician was a pediatrician who could not provide her care. Wilson then contacted nine physicians on Ambetter's provider list — none of whom accepted the Ambetter policy. Ultimately, Wilson consulted an out-of-network physician to receive care for

her medical condition and switched insurance policies. She was never able to use her Ambetter policy to see a healthcare provider.

Plaintiffs Erin and Nicholas Angelo also reviewed the Ambetter provider directory prior to purchasing their policy in December 2016. At the time, Erin was pregnant with twins in a single amniotic sac, which was a high-risk pregnancy, requiring the care of a maternal-fetal medicine specialist. One reason the Angelos selected the Ambetter policy was because Erin's obstetrician with a specialty in maternal-fetal medicine was listed as an in-network provider. Shortly after purchasing the policy, Erin discovered the obstetrician had stopped accepting Ambetter insurance due to Ambetter's poor payment record. The Angelos searched for another in-network obstetrician with the same specialty but found none nearby. Ambetter offered a maternal-fetal medicine specialist in Houston, which was a four-hour drive from the Angelos' home in Pflugerville. Without an in-network specialist nearby, the Angelos used their own funds to pay Erin's original obstetrician.

As the time for delivery approached, Ambetter referred Erin to a clinic and then refused to pay the bill. The clinic refused to deliver her babies. Ambetter then referred her to an obstetrician at a free clinic who delivered the twins at an in-network hospital. The premature twins required care in the hospital's neonatal intensive care unit, which resulted in a bill for just over $20,000. Ambetter again refused to pay the bill. The Angelos spent the next two years disputing the bill and ultimately negotiated a settlement, requiring them to pay $1,500.

The Plaintiffs filed this class action, asserting breach of contract, breach of warranty, and claims under the Texas Deceptive Trade Practice Act. Upon Superior's motion to dismiss, the magistrate judge recommended dismissing the breach-of-warranty and Deceptive Trade Practice Act claims.

He concluded the Plaintiffs adequately pled a breach-of-contract claim, referring to the "specific promises and obligations Defendants made to Plaintiffs in the Ambetter Contract in exchange for their premium payments." "Th[ese] promises include[d] providing insureds with an accurate list of network providers; '[c]omplete medical coverage that meets [their] medical needs and contains all of the Essential Health Benefits;' a [Qualified Health Plan] that [Superior] has certified meets ACA's network adequacy requirements; and adequate access to physicians and medical practitioners and treatments or services." The alleged breach of these promises resulted in the Plaintiffs' damages. The district court agreed, and the breach-of-contract claim survived.

The Plaintiffs moved for class certification, arguing the Plaintiffs and the class had Article III standing. Relying on their expert's report, the Plaintiffs alleged that Ambetter's provider directory "contains on average 49% of practitioners who are in fact not active network participants." Further, "[a] portion of every Ambetter policyholder's premium represents payment for the availability of the providers published" such that "every 1% change in network size is associated with a 0.29% change in policy premium." They alleged that each policy holder had been overcharged "[t]o the extent th[e] published list is inaccurate."

Superior opposed the motion, contending the Plaintiffs' class-wide injury theory of overpayment based on an overstated provider list was invalid because Superior never promised "a specific number of providers." Because the Plaintiffs' "damages model [wa]s based solely on this invalid theory," Superior asserted the Plaintiffs failed to establish the concrete injury-in-fact required to establish Article III standing.

Superior also moved to strike the testimony of the Plaintiffs' damages expert. Among its arguments was that the expert's class-wide damages

model neither "fit the facts" nor the Plaintiffs' theory of liability. Superior maintained the model did not fit the facts because it was based on the counterfactual assumption "that Superior promised its customers a certain network 'breadth' — defined as the number of in-network providers in proportion to the number of providers in the area — but Superior [] never made any such promise." Relatedly, Superior argues the model did not fit the Plaintiffs' theory of liability — breach of a contractual promise to provide a current directory — because a current directory is not synonymous with a directory of a certain breadth, and the expert failed to measure damages from an inaccurate directory.

The district court referred both motions to a different magistrate judge. The magistrate judge denied Superior's motion to strike because Superior "contest[ed] the basis of the [expert's] opinion," which should "go to the weight of and not admissibility of [the expert's] testimony." He further recommended denying the Plaintiffs' motion for class certification. Characterizing the Plaintiffs' injury argument as an "overcharge-by-fraud theory," the magistrate judge concluded that "Plaintiffs have not pleaded facts sufficient to show that they had reasonable expectations with respect to the size of the provider network such that the prices paid for access to the network were inflated."

In reaching this conclusion, the magistrate judge faulted the Plaintiffs' expert opinion, stating, "[t]he assumption underlying Plaintiffs' overcharge theory is that network size meaningfully accounts for higher premiums," but the Plaintiffs' expert model only showed "correlation, not causation." Because the model failed to account for other factors which impact the cost of premiums, the Plaintiffs failed to "adequately establish[] that the value of the service for which they paid is measured primarily by network size, and that the premiums they paid were inflated as a result of the alleged discrepancy between promised network size and actual network size."

Accordingly, the magistrate judge concluded the Plaintiffs had not "plausibly pleaded an injury in fact" and therefore lacked standing to bring their claim. Because the suit did not "present a justiciable case or controversy under Article III," the magistrate judge did not reach the class-certification question. The Plaintiffs objected to the Report and Recommendations.

The district court adopted the Report and Recommendations and denied the Plaintiffs' motion for class certification. The Plaintiffs timely petitioned for leave to appeal under Federal Rule of Civil Procedure 23(f), which this court granted. The district court stayed the case pending the resolution of this appeal.

## DISCUSSION

The Plaintiffs contend the district court erred in determining they lacked standing because (1) the court employed an incorrect legal standard to the causation element of standing, (2) the court wrongly characterized their injury theory as relying on the promise of a network of a particular size, (3) they pleaded sufficient facts to show injury-in-fact, and (4) the court improperly engaged in a merits-based evaluation of their expert testimony, impermissibly choosing a side in the "battle of the experts."

Although the parties do not frame the issues this way, the question presented by this appeal is the manner and degree of proof required to establish injury-in-fact at the class-certification stage. The resolution of this question necessarily requires resolution of a different one: what is "the appropriate means by which to evaluate whether a plaintiff has standing to represent a class?" *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 733

(5th Cir. 2023). We must resolve this preliminary question before turning to the parties' claims.

### I.    Standing: Legal Standard

Generally, appeals under Rule 23(f) only permit consideration of the issue of class certification, but because the district court's denial of the Plaintiffs' motion for class certification was premised on their lack of standing, we must address standing. *E.g.*, *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001) ("Standing is an inherent prerequisite to the class certification inquiry. . . ."). Standing is a question of law that we review *de novo*, while any fact-finding is reviewed for clear error. *Chavez v. Plan Benefit Servs., Inc.*, 108 F.4th 297, 305–06 (5th Cir.), *cert. denied*, 145 S. Ct. 774 (2024). Whether a plaintiff has standing "is the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To establish standing, the plaintiff bears the burden of showing "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the Defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

In the class-action context, the class representative must have standing to represent a class of other allegedly injured persons. *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 769 (5th Cir. 2020). "After all, if the class representative lacks standing, then there is no Article III suit to begin with — class certification or otherwise." *Id.* Accordingly, if the class representative presents a standing problem, as the district court determined to be the case here, it must be addressed prior to deciding class certification. *Id.*

Although the appropriate test for determining standing at the class-certification stage "was not raised by the parties or considered by the district

court, we must — where necessary — raise it *sua sponte*." *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 332 (5th Cir. 2002). Identifying the appropriate test for standing in the class-certification context is important because that determines the appropriate lens through which to measure the manner and degree of evidence required.

The line between the issues of standing and class certification is hazy, as "they both aim to measure whether the proper party is before the court to tender the issues for litigation." 1 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 2:6 (6th ed. 2022) ("*Newberg on Class Actions*"). The confusion stems from the disjuncture that may arise where the "class representative may seek to litigate harms not precisely analogous to the ones she suffered but harms that were nonetheless suffered by other class members." *Chavez*, 108 F.4th at 307 (quoting *Newberg on Class Actions* § 2:6). There is a circuit split regarding the appropriate test for determining a plaintiff's standing at the class-certification stage, and our court has not yet weighed in on the correct approach. There is the (1) "more forgiving 'class certification' approach,'" and (2) "more intensive 'standing approach.'" *Angell*, 67 F.4th at 734 (quoting *Newberg on Class Actions* § 2:6). We adopt the class certification approach for the reasons discussed below.

## A.    *Class Certification Approach*

The class certification approach evaluates only a named plaintiff's individual standing. *Id.* The court's determination that the named plaintiff demonstrated individual standing concludes the inquiry. *Id.* Only then should the court "address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of

others." *Id.* (quoting *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279–80 (11th Cir. 2000)); *see also* FED. R. CIV. P. 23(a).

The Supreme Court first addressed the distinction between standing and class certification in *Sosna v. Iowa*, 419 U.S. 393 (1975). The Court held that "the intervening resolution of the controversy as to the named plaintiffs" did not inexorably moot a class-action suit where "the issue sought to be litigated escapes full appellate review at the behest of any single challenger." *Id.* at 401. In so holding, the Court noted that the named plaintiff still "must show that the threat of injury in a case such as this is 'real and immediate,' not 'conjectural' or 'hypothetical,'" and he or she "must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court." *Id.* at 403 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

Relevant to this appeal, the Court appeared to endorse the class-certification approach, noting that its "conclusion [that the plaintiff has standing] does not automatically establish that appellant is entitled to litigate the interests of the class she seeks to represent, but it does *shift the focus* of examination from the elements of justiciability to the ability of the named representative to 'fairly and adequately protect the interests of the class.'" *Id.* (emphasis added) (quoting FED. R. CIV. P. 23(a)). The Court employed this approach again in 1982, when it held that a Mexican-American class representative who was denied a *promotion* could not represent a class of Mexican-Americans whose job *applications* had been denied. *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158–59 (1982). Importantly, the Court

arrived at this conclusion via Rule 23(a)'s typicality and adequacy requirements, not standing doctrine. *Id.* at 157–59.

Presently, the First, Third, Sixth, and Ninth Circuits employ the class-certification approach.[1]   Moreover, this approach has gained "prominence in the district courts of most circuits, including our own." *Chavez*, 108 F.4th at 308 n.1 (collecting cases).  We now turn our attention to the standing approach.

### B.   Standing Approach

Conversely, the standing approach "compare[s] the injuries or interests of the named plaintiff with those of the putative class and will hold that the named plaintiff lacks standing for the class claims if his or her harms are not sufficiently analogous to those suffered by the rest of the class." *Angell*, 67 F.4th at 734.  Under this approach, there are "three different avenues" for determining whether the plaintiff's injury is sufficiently similar to that of the class. *Chavez*, 108 F.4th at 312.

The first avenue, the *Lewis* test, requires courts to "analyze whether Plaintiffs alleged a harm that is unique to them, such that it would be

---

[1] *See, e.g.*, *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018) ("Nothing . . . suggests that the claims of the named plaintiffs must in all respects be identical to the claims of each class member.  Requiring that . . . to establish standing would confuse the requirements of Article III and Rule 23." (alteration adopted) (quotation marks and citation omitted) (quoting *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 421 (6th Cir. 1998)); *Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 133 (3d Cir. 2022) (explaining that named plaintiffs established standing and that defendants' "concerns regarding the representation of absent class members might implicate class certification or damages but are distinct from the requirements of Article III"); *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998) ("Once his standing has been established, whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in [Rule 23].")); *Melendres v. Arpaio*, 784 F.3d 1254, 1261–62 (9th Cir. 2015) (adopting the same approach).

unsuitable to permit other nonrelated harms in the same lawsuit." *Id.* at 313 (citing *Lewis v. Casey*, 518 U.S. 343, 358 (1996)). Second, the *Gratz* test "requires us to evaluate if Plaintiffs' injury implicates 'a significantly different set of concerns' from the other potential class members." *Id.* (quoting *Gratz v. Bollinger*, 539 U.S. 244, 265 (2003)). Finally, the third avenue, employed by the Second and Eleventh Circuits,[2] is a hybrid version of the *Lewis* and *Gratz* tests. *Id.* The two tests are somewhat different, but both "yield[] the same result." *Id.* The Second Circuit test requires courts to evaluate (1) whether the plaintiff "personally suffered some actual injury" from the defendant's illegal conduct, and (2) if that "conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class." *Id.* (alterations adopted) (quoting *Barrows*, 24 F.4th at 129). In short, the standing approach blends aspects of the traditional standing inquiry with certain Rule 23 considerations.

C.    *Adopting the Class Certification Approach*

Both the class-certification approach and the standing approach require an assessment of the named plaintiff's individual standing. The key difference between the two approaches pertains to the stage at which the court examines the sufficiency of the relationship between the class representative's harm and the harms suffered by class members. Relevant to this appeal, it also determines the stage at which the court may delve into merits-based inquiries. As the Supreme Court noted in *Gratz*, there is "tension" in the precedent regarding whether such matters are appropriately framed as issues of standing or adequacy. 539 U.S. at 263 & n.15. We conclude that the class-certification approach appropriately serves the

---

[2] *See, e.g.*, *Barrows v. Becerra*, 24 F.4th 116, 129 (2d Cir. 2022); *Fox v. Ritz-Carlton Hotel Co.*, 977 F.3d 1039, 1047 (11th Cir. 2020).

distinct functions and rationales of Article III standing and class certification under Rule 23.

First, and most obviously, the class-certification approach simplifies the analysis, allowing the standing and class-certification inquiries to serve their respective functions. The standing doctrine "is primarily concerned with ensuring that a real case or controversy exists," while "Rule 23(a)'s requirements are designed precisely to address concerns about the relationship between the class representative and the class." *Newberg on Class Actions* § 2:6. Insofar as the standing approach incorporates Rule 23 considerations, it prematurely and unnecessarily muddies the waters for the threshold constitutional issue of justiciability.

This case illustrates that concern. The district court's standing determination was largely based on purported deficiencies in the Plaintiffs' expert's report. As discussed below, the use of expert testimony at the class-certification stage often presents complex questions regarding the degree to which the court should engage in merits-based inquiries. *See Prantil v. Arkema Inc.*, 986 F.3d 570, 575 (5th Cir. 2021). So, to the extent the class-certification approach allows courts to proceed past the standing inquiry before weighing the necessity of engaging in merits-based inquiries at the certification stage, it is the better approach.

Although we adopt the class-certification approach and conclude the district court erred by failing to employ either approach when determining the Plaintiffs' standing, this conclusion does not resolve this appeal. The court concluded the named Plaintiffs lacked *individual* standing, which would be dispositive of their claims under either the standing or class-certification approach. Accordingly, we next consider the issues the Plaintiffs raised on appeal, which in their totality, amount to the contention that the court

improperly considered merits evidence when determining whether they had standing.

## II.    *Standing: Merits Evidence*

Appeals under Federal Rule of Civil Procedure 23(f) are limited and do not permit a general inquiry into the merits of the plaintiff's claims, but we "must[] review the merits of the district court's theory of liability insofar as they also concern issues relevant to class certification." *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 381 (5th Cir. 2007). It logically follows that we have jurisdiction to review the merits of the district court's theory of liability insofar as the denial of class certification was based on its conclusion that the Plaintiffs lacked Article III standing. *E.g.*, *Bertulli*, 242 F.3d at 294–95 (considering merits of Defendants' no-standing contention).

### A.    *Forfeiture*

As a threshold matter, Superior contends the Plaintiffs forfeited any challenge to the district court's determination that the Plaintiffs failed to provide sufficient evidence of injury-in-fact, and our court should affirm on that basis.

The Plaintiffs challenge the legal standard employed by the district court regarding the causation element of standing. They contend the court employed a causation standard more rigorous than the "fairly traceable" standard when it stated that "Plaintiffs have not adequately established that the value of the service for which they paid is measured *primarily* by network size, and that the premiums they paid were inflated as a result of the alleged discrepancy between promised network size and actual network size." As further evidence, the Plaintiffs note the district court's observation that their expert's report modeling the relationship between network size and policy premiums merely demonstrated "correlation, not causation." According to

the Plaintiffs, the appropriate legal standard is that the injury (the premium overcharge) must be fairly traceable to Superior's conduct. *See Lujan*, 504 U.S. at 560.

The Plaintiffs misconstrue the district court's analysis here. Although the district court uses language that appears to invoke the causation element, ultimately its point was not whether the overcharge was fairly traceable to Superior, but instead whether the Plaintiffs were overcharged at all. In other words, as Superior correctly notes, the challenged analysis relates to the injury-in-fact prong.

Superior contends that because the Plaintiffs erroneously challenge the district court's determination under the causation prong, they inadequately brief any challenge to the injury-in-fact prong resulting in forfeiture. The Plaintiffs, however, devote an entire section of their brief to challenging the court's injury-in-fact determination. "To be adequate, a brief must address the district court's analysis and explain how it erred." *Smith v. Sch. Bd. of Concordia Par.*, 88 F.4th 588, 594 (5th Cir. 2023) (quoting *Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 751 (5th Cir. 2023)). Considering the Plaintiffs' brief includes the standard of review, discusses applicable law, and explains their position regarding how the district court erred in reaching its injury-in-fact determination, the Plaintiffs did not forfeit the issue. *See id.*

To the extent Superior's forfeiture argument is based on the Plaintiffs' failure to make the specific argument that their expert's model was sufficient evidence of injury-in-fact, for the reasons discussed below, the Plaintiffs were not required to do so. In any event, the Plaintiffs *do* make this argument. The remainder of the Plaintiffs' issues relate to the degree of evidence required to prove injury-in-fact at this stage of litigation.

### B.    *Degree of Evidence*

To review, the Plaintiffs' remaining issues are as follows: the district court erroneously concluded that the Plaintiffs failed to plead facts necessary to establish an injury-in-fact; erroneously characterized the Plaintiffs' injury theory; and impermissibly chose a side in the "battle of the experts." Although the district court used some language to suggest its standing determination was based on inadequate pleadings, it appears the determination was based on insufficient evidence. We will proceed under the assumption that the court faulted the sufficiency of the evidence, because the adequacy of the pleadings was already addressed at the Rule 12(b)(6) stage.

Before the district court, Superior asserted that the Plaintiffs' breach-of-contract claim was based on Superior's alleged promise to provide a network with a particular number of network providers. In opposing the Plaintiffs' motion for class certification, Superior challenged standing for the first time, focusing on the injury-in-fact prong. In relevant part, Superior contended the Plaintiffs could not demonstrate an injury-in-fact because: (1) their class-wide theory of injury was based on a promise of a network of a certain size and Superior made no such promise; and, relatedly, (2) their expert's damages model hinged on this promise that was not made and accordingly, did not fit the facts of the case.

Apparently adopting Superior's characterization of the Plaintiffs' theory, the district court stated, "Plaintiffs' theory of their overcharge injury rests on the counterfactual assumptions that insureds were promised (or that Defendants represented) that a provider network of a certain size would be available and that provider network size, in any event, is static." Accordingly, the court concluded the Plaintiffs did not "plead[] any facts supporting the claim that they had reasonable expectations of network size."

We disagree with this characterization of the Plaintiffs' theory. They do not claim that Superior promised access to a particular number of providers. Instead, they claim that the network was falsely represented as accurate, adequate, and up-to-date; and as a result, each policyholder was overcharged to the extent the network was inaccurate. The size of the network is certainly relevant in determining the extent to which policyholders were overcharged, but the extent of any injury is beyond the scope of the standing inquiry. Insofar as the district court reached its standing determination by characterizing the Plaintiffs' injury theory as resting on a "counterfactual" promise of a network of a particular size, that was error.

Turning to evidentiary matters, the district court concluded "Plaintiffs [had] not adequately established that the value of the service for which they paid is measured primarily by network size, and that the premiums they paid were inflated as a result of the alleged discrepancy between promised network size and actual network size." Put simply, the court did not find the Plaintiffs' expert's damages model convincing.

As noted, "[a] plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *TransUnion*, 594 U.S. at 431 (quoting *Lujan*, 504 U.S. at 561). Thus, while general factual allegations of injury may suffice for a motion to dismiss, by the time a court reaches the summary-judgment stage, for example, the plaintiff "must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (quotation marks and citation omitted). This appeal arises at the class-certification stage — beyond the motion-to-dismiss stage but before a motion for summary judgment.

In considering a plaintiff's Article III standing in the Rule 23 context, courts "must assume *arguendo* the merits of his or her legal claim." *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007) (quoting *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007)); *see also Warth*, 422 U.S. at 501–02. Because the Plaintiffs' ability to recover for a claim "under governing law is a separate question" from standing, "it is sufficient for standing purposes that the Plaintiffs seek recovery for an economic harm that they allege they have suffered." *Cole*, 484 F.3d at 723. A court is generally "free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005) (quoting *Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004)). We agree with an earlier panel of this court that caution should be exercised when assessing evidence of standing at the class-certification stage, especially when "some elements of standing might be said to be intertwined with the merits." *Robertson v. Monsanto Co.*, 287 F. App'x 354, 360 (5th Cir. 2008); *see also* 13A Wright, Miller, & Cooper, Federal Practice & Procedure § 3531.15, at 99–100 (2d ed. 1984 & Supp. 2008). In *Robertson*, a panel of this court held that where there is "substantial overlap between" standing and the merits of a plaintiff's claim, "the better course" is to treat the attack on standing "as an attack on the merits — and therefore outside the scope of our Rule 23(f) review of class certification decisions — rather than as a question of standing." 287 F. App'x at 360. We agree with that analysis.

Here, despite concluding the Plaintiffs' expert opinion was admissible and questions about the "basis" of the expert opinion or its assumptions "go to the weight of and not admissibility" of the opinion, the district court used the expert opinion to conclude the Plaintiffs failed to establish a sufficient connection between network size and price. The court characterized the Plaintiff's injury argument as an "overcharge-by-fraud theory," under which

the Plaintiffs "seek[] to recover for a purported economic injury rather than any risk of physical injury." *Earl v. Boeing Co.*, 53 F.4th 897, 902 (5th Cir. 2022). In noting that overcharge injuries typically require plaintiffs to "plead facts sufficient to demonstrate plausible expectations or affirmative misrepresentations as the basis of their injury," the district court stated that the Plaintiffs did not plead facts sufficient to show "they had reasonable expectations with respect to the size of the provider network such that the prices paid for access to the network were inflated."

Superior maintains the Plaintiffs' evidence — specifically, their expert report — was insufficient to prove injury-in-fact.[3] In doing so, they contend the Plaintiffs were required to prove that their premiums would have been lower *but for* the alleged inaccuracies in the provider list. In other words, the appropriate way to determine whether overpayments occurred is to compare real-world transactions to those in "a hypothetical world where the [alleged] fraud didn't happen." *Earl*, 53 F.4th at 903.

In *Earl*, the plaintiffs alleged that they paid inflated prices for airline tickets because the actual value of those tickets for most passengers was zero where the defendants concealed defects in the MAX 8 plane that posed serious risks of injury or death. *Id.* at 902. The plaintiffs claimed that had the public known about the defects, demand for tickets would have dropped

---

[3] Superior initially contends that the Plaintiffs provided *no* evidence to support their injury-in-fact, which, according to Superior, they were required to do by *Ford*, 301 F.3d at 332 (requiring plaintiff to affirmatively prove elements of standing with record evidence at summary-judgment stage) and *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) (factual attack challenging subject-matter jurisdiction requires plaintiff to show jurisdiction does in fact exist). The Plaintiffs clearly provided evidence of injury-in-fact, including affidavits from the named Plaintiffs, the disputed contract, and most importantly, their expert report (a report which the district court deemed admissible).

and the airlines would have been forced to lower their prices. *Id.* *Earl* presents facial similarities to the instant case in that it involved a question of standing at the class-certification stage, as well as an expert report, but this is where the similarities end. *Id.*

In concluding the plaintiffs in *Earl* had not suffered an injury-in-fact (and thereby failed to establish standing), we found that the plaintiffs' injury theory was untenable. *Id.* at 903. The plaintiffs' theory relied "on two unsupportable inferences:" (1) airlines "would have continued offering the same MAX 8 flights" even in the face of widespread public knowledge of the defect; and (2) "the FAA would have permitted airlines to fly the MAX 8 even with full knowledge of the . . . defect." *Id.* Although we referenced the plaintiffs' expert report in *Earl*, our holding was not based on the damages-model's inability to measure damages relative to the injury alleged. *Id.* at 902. Instead, our holding was based on the premise of the effect of the wrongful conduct itself. We concluded that it was an unsupportable inference to assume that airline tickets prices would go down had the defect been widely known to the public. *Id.* at 903. In fact, it was more likely that ticket prices would go up due to the shortage of available flights. *Id.*

In contrast, it is not an unsupportable inference to assume that the Plaintiffs in this case would have expected to pay less for access to an inaccurate and inadequate provider network, or, more likely, that the Plaintiffs would not have purchased the Ambetter policy at all. Moreover, unlike the plaintiffs in *Earl*, here, the Plaintiffs had a contract with Superior, which promised to provide insureds with, *inter alia*: an accurate list of network providers; complete medical coverage that meets their essential medical needs and contains all of the Essential Health Benefits; a Qualified Health Plan that Superior has certified meets ACA's network adequacy requirements; and adequate access to physicians and medical practitioners and treatments or services. In short, this case is distinguishable from *Earl*.

The district court determined the Plaintiffs failed to establish injury-in-fact because their expert report did not prove a causal connection between the size of the network and premium price, which is what the Plaintiffs would have to prove to prevail on the merits of their breach-of-contract claim. This merits-based evaluation of expert reports to determine standing at the class-certification stage is precisely what *Robertson* cautioned against. 287 F. App'x at 360 (rejecting defendant's standing argument at class-certification stage based on experts' air modeling reports allegedly establishing plaintiffs were never exposed to harmful concentrations of ammonia); *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 323 n.6 (5th Cir. 2005) ("[C]ourts are not to insist upon a 'battle of the experts' at the certification stage."). In analogous scenarios, we have held that it is improper for the district court to resolve factual disputes when "the subject-matter jurisdiction and merits questions are coterminous." *See Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1030 (5th Cir. 2022). Contrary to Superior's assertion that the injury-in-fact question is not "coterminous" with the underlying merits, it is. *See id.*

This case is more analogous to those in which we have held the plaintiffs had standing. *See, e.g.*, *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298 (5th Cir. 2009); *Cole*, 484 F.3d at 723. In *Mims*, the defendant alleged error in the district court's "certifying the plaintiffs' proposed RESPA class when the named plaintiffs lack[ed] standing to assert a claim." *Id.* at 302. We concluded that although the defendant framed the issue as one of standing, "the substance of its argument is that the plaintiffs fail to state a claim under RESPA on the merits." *Id.* Along that line, we held "there [wa]s no serious question that the plaintiffs [had] standing to bring this claim. They [] alleged an injury-in-fact (overpayment of premiums for title insurance issued upon refinancing their mortgage), causation (the defendants

overbilled for the premiums) and redressability (if plaintiffs are successful, they will be refunded the overpayment)." *Id.*

Similarly, the Plaintiffs have alleged and provided evidence for an injury-in-fact (overcharges for a health insurance policy that contained materially inaccurate and insufficient provider lists), causation (the amount of overcharge is fairly traceable to the discrepancy between the promised network size and the actual network size), and redressability (if the Plaintiffs are successful, they will be refunded their overpayment). *See Cole*, 484 F.3d at 723 (standing found at class-certification stage under overcharge theory where "Plaintiffs s[ought] recovery for their actual economic harm (*e.g.*, overpayment, loss in value, or loss of usefulness) emanating from the loss of their benefit of the bargain"). The district court's standing determination was, in substance, a determination on the merits of the "overcharge-by-fraud" theory.[4]

Superior contends that any merits-based evaluations were proper in this context, relying on *Prantil* and *Unger*. Both cases pertain to evidentiary evaluations of expert opinions at the class-certification stage. In *Prantil*, we held that Plaintiffs must clear "the *Daubert* hurdle" "when the cementing of relationships among proffered class members of liability or damages or both turns on scientific evidence." *Prantil*, 986 F.3d at 575 (referencing trial-

---

[4] Notably, the district court seemed to believe that the named Plaintiffs have individual standing. Instead of dismissing the Plaintiffs' case, as would be the appropriate course of action if the named Plaintiffs truly lacked Article III standing, the district court denied class certification and set a summary judgment briefing schedule that was later stayed by stipulation pending resolution of this appeal. *See Earl*, 53 F.4th at 903 ("They have offered no plausible theory of economic harm . . . .[P]laintiffs have suffered no injury in fact and lack Article III standing. Their case therefore must be dismissed."); *Newberg on Class Actions* § 2:6 ("Because individual standing requirements constitute a threshold inquiry, the proper procedure when the class plaintiff lacks individual standing is to dismiss the complaint, not to deny class certification.").

admissibility standard for expert testimony set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). In other words, "when scientific evidence is relevant to the decision to certify," the "metric of admissibility" is the same for both certification and trial. *Id.* At this stage, however, the *Daubert* inquiry should be limited to the relevance and reliability of the expert's testimony as it relates to class certification under Rule 23. *See Unger*, 401 F.3d at 323 n.6.

Superior's argument underscores the confusion we aim to ameliorate by adopting the above-described class-certification approach to standing. Under this approach, standing and certification are two discrete inquiries. So, merits-based evaluations of expert opinions are relevant for Rule 23 purposes but are premature for the purposes of standing at this stage of litigation.

In any event, the district court's evaluation of the Plaintiffs' expert report likely does not fall within the limited, merits-based inquiries permissible at the class-certification stage. It can hardly be said that the expert opinion was relevant to the district court's decision to certify, as it did not reach the certification question due to its standing determination. Moreover, even assuming the district court ventured into a certification analysis when it evaluated the Plaintiffs' expert's damages model, none of the purported deficiencies were related to the relationships among class members to the alleged liability or damages. *See Prantil*, 986 F.3d at 575. As the district court specifically noted, because "exclusion is limited to an inquiry as to relevance to class certification requirements, [the expert's] testimony should not be excluded." This shows that any qualms the district court had with the Plaintiffs' expert testimony were merits-based.

As discussed above, where there is "substantial overlap between" standing and the merits of a plaintiff's claim, "the better course" is to treat

the attack on standing "as an attack on the merits — and therefore outside the scope of our Rule 23(f) review of class certification decisions — rather than as a question of standing." *Robertson*, 287 F. App'x at 360. Adopting the class-certification approach reinforces this view that merits-based evaluations of standing at this stage are premature. Accordingly, the district court erred insofar as it made merits-based evaluations of the Plaintiffs' expert's opinion at this stage.

Although the Plaintiffs will ultimately have to prove whether and to what extent they were overcharged based on the inadequacy of the network, they do not need to prove how to measure that injury in dollars at the class-certification stage.

## CONCLUSION

Under the class-certification approach, a plaintiff need only establish his or her individual standing. Only then should the court "proceed[] to consider whether the Rule 23(a) prerequisites for class certification have been met." *Chavez*, 108 F.4th at 309 (quoting *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019)). To the extent merits-based evaluations of expert testimony are necessary at the certification stage, they are premature in determining standing.

Because we conclude the district court employed the wrong legal standard in evaluating the Plaintiffs' standing as a threshold matter, we do not address Superior's alternative contentions regarding the Plaintiffs' inability to satisfy class-certification requirements. Under the class-certification approach, standing is an independent inquiry from certification, and a named plaintiff's individual standing is sufficient.

We VACATE the district court's order denying the Plaintiffs' motion for class certification and REMAND for further proceedings consistent with this opinion.